Filed 4/22/25  Hughes v. Target Corporation CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| KATHY HUGHES, | H050996, H051227, H051318 |
| Plaintiff and Appellant, | (Santa Clara County Super. Ct. No. 17CV317411) |
| v. | |
| TARGET CORPORATION, | |
| Defendant and Respondent. | |

Plaintiff Kathy Hughes had a negative experience with store employees of defendant Target Corporation, an experience she attributes to being "profiled" for her "observable physical characteristics" of being female and of Portuguese descent.  Her account of the interaction differed starkly from the employees'.  Hughes rejected Target's Code of Civil Procedure section 998 settlement offers;[1] Target won a defense judgment and a $67,313.97 cost award.  We affirm.

## I.  BACKGROUND

Hughes went to Target in October 2015.  The details of her visit are disputed, but the parties agree that she interacted with Eric Santiago, a uniformed entry-level Target security guard who accused her of having made a fraudulent return of merchandise on a prior visit, and Chris Beagle, an assistant manager who was summoned to intercede.

---

[1] Undesignated statutory references are to the Code of Civil Procedure.

Hughes sued Target in October 2017, alleging that Target's security confronted her without probable cause and that management endorsed the conduct.

## A. *The Operative Complaint and Pretrial Proceedings*

In her operative third amended complaint, Hughes pleaded three causes of action: (1) general negligence; (2) intentional infliction of emotional distress; and (3) violation of the Unruh Civil Rights Act (Civ. Code, § 51 et seq.). In support, Hughes alleged that she entered a Target store carrying a small purse and intending only to develop photos. After using a self-service machine but before paying at the customer service checkout, Hughes was confronted by a uniformed Target security guard who accused her of trespassing. At Hughes's request, a Target manager joined the conversation and, with the security guard, unsuccessfully sought proof that Hughes was barred from the store in Target's security office. Nevertheless, the manager and the security guard did not apologize but told her she had to leave and could not come back. Hughes paid for her photos at the customer service counter and left. Hughes alleges that Target's employees "profil[ed]" her as a Portuguese female and intentionally caused her severe emotional distress, or at least negligently injured her.

In 2019, after Hughes, Santiago, and Beagle had all been deposed and the parties had participated in an unsuccessful private mediation, Target made a section 998 settlement offer through which it offered to resolve Hughes's claims for $15,000, with the parties to bear their own attorney fees and costs. Hughes did not accept.

In 2020, Target secured summary adjudication of Hughes's claims for intentional infliction of emotional distress and violation of the Unruh Civil Rights Act. The trial court determined that Hughes could neither prove outrageous conduct nor that Target acted based on her gender or Portuguese heritage.

In 2023, a few weeks before trial, Target made a second section 998 settlement offer through which it offered to resolve Hughes's claims for $25,000, with the parties to bear their own attorney fees and costs. Hughes again did not accept.

2

**B.**    *Trial Evidence*

At trial on her negligence claim, Hughes testified that she was born in California to Portuguese immigrants.

According to Hughes, she printed photographs using Target's Kodak machine and stood in line at customer service to pay and collect the prints. While in line, she noticed Santiago dressed in a Target security uniform and staring at her. When she reached the register, Santiago asked her, " 'Didn't I tell you never to set foot in this store?' " When pressed, Santiago insisted that she had " 'signed a paper for trespass.' " Hughes had done nothing wrong in a Target store or signed such a paper. At Hughes's request, the cashier at the customer service desk called a manager.

By the time Beagle arrived, Hughes was "crying and . . . shaking and . . . very confused." Claiming to have proof that Hughes was not allowed in the store, Santiago told Beagle that Hughes was trespassing. Beagle told Hughes that he and Santiago would go look for proof. While awaiting their return, Hughes called the police but could not persuade them to intervene. Beagle and Santiago finally returned, unable to supply proof, and Beagle still asked Hughes to leave because he had " 'to support [his] security.' " Hughes, who had expected an apology, was left crying and shaking. Hughes paid for her photos and left.

Santiago and Beagle described events differently.

Santiago testified that he stopped Hughes from making a return without a receipt because she looked like someone another security guard had flagged for suspicion of return fraud. Santiago believed he recognized Hughes from a photo and a brief narrative description from another security employee but could not recall whether he had seen the picture on a monitor or in a physical "BOLO" binder. When Hughes insisted that Santiago explain why he stopped her from making the return, he led her to the side of the counter "away from everybody" and told her that he suspected her of return fraud.

3

Hughes "exploded on" Santiago with "just about all the curse words in the book."
Summoned by Santiago, Beagle attempted to calm Hughes down.

Beagle testified that Hughes, plainly the aggressor, was "irate . . . at a level ten" when he arrived. Santiago told Beagle, "[T]here was an issue doing a return." Beagle denied that trespass was ever mentioned, denied ever telling Hughes that she had to leave the store, and denied saying that he had to listen to or back up his security personnel. His initial attempts to calm Hughes failed, as she "was swearing at [Beagle], she was calling [Beagle] names, she was calling [Santiago] names." So he and Santiago went to the security office to try to find the documentation Santiago had relied on, but they found nothing. Beagle returned to Hughes and told her she was free to shop, but he asked her to "lower her voice and not use inappropriate language." Because he thought Hughes seemed to have calmed down, Beagle did not report the incident to anybody. Beagle thought based on his common practice that he likely apologized to Hughes, but he could not remember doing so.

Beagle also testified that the self-service photo machines at the store printed the pictures, suggesting that collecting photos would not have required a visit to the customer service counter.[2]

## C.    *Verdict and Costs*

In a special verdict, the jury found that Target was not negligent. The trial court entered a defense judgment.

After judgment, Target filed a memorandum of costs claiming $67,313.97. Hughes moved to strike or tax the costs. The trial court denied Hughes's motion, awarding Target the full amount sought.

---

[2] When cross-examined, Hughes allowed that the photos may have printed at the machine but maintained that she had to pay for them at the customer service desk. Hughes did not supply receipts, bank records, or photos supporting her contention that she printed out photos on the day of the incident.

Hughes timely appealed.

## II. DISCUSSION

Hughes's appellate contentions focus on the jury's determination that Target was not negligent, the trial court's summary adjudication of her claims for violation of the Unruh Civil Rights Act and intentional infliction of emotional distress, and the award of costs. We reject her challenges to the jury's verdict, summary adjudication of the Unruh Civil Rights Act claim, and the award of costs. And summary adjudication of her claim for intentional infliction of emotional distress, even if it were erroneous, was harmless given the jury's resolution of issues in common with her negligence claim. We will accordingly affirm the judgment.

### A. *Jury Trial*

The crux of the trial was the conflicting testimony of Hughes, Santiago, and Beagle, and the extent to which their respective credibility was bolstered or undermined by corroborating evidence or its absence. Hughes's primary contention, permeating her brief, is that Target spoliated and concealed evidence and premised its defense on false testimony.

Hughes also raises three discrete claims of trial error: (1) the trial court allowed Target to condition the jury with improper voir dire; (2) the trial court misapplied *People v. Sanchez* (2016) 63 Cal.4th 665 (*Sanchez*) in ruling on hearsay objections to expert testimony at trial; and (3) the trial court improperly excluded certain of Target's discovery responses Hughes offered as trial evidence. Hughes has not demonstrated any prejudicial error.

#### 1. *Hughes's Contention that Target Fabricated a Narrative by Spoliating and Concealing Evidence and Relying on False Testimony*

Target's trial theory was that Santiago reasonably, if erroneously, believed that Hughes was committing return fraud, exercised his discretion to prevent her from making

5

a return without a receipt, and enlisted Beagle to deescalate the situation when Hughes became verbally abusive.

Hughes contends that Target either knew from the absence of corroborating evidence that its version of events could not be true, or else concealed evidence it knew would have corroborated her version of the facts. Hughes relies on Target's failure to produce: (1) whatever documents, if any, caused Santiago to suspect Hughes of wrongdoing; (2) the identity of the security employee, if any, who provided whatever information Santiago acted on; (3) the identity of the customer service employee with whom Hughes interacted during the incident; or (4) the video recording of the incident.[3] Hughes further complains that Target abused the discovery process by (1) introducing evidence of a "BOLO" binder it had not disclosed and (2) misidentifying in discovery an asset protection business partner as the regional head of security, while (3) claiming that Hughes's discovery requests were unduly burdensome.

To the extent Hughes's concerns are based on Target's conduct in discovery or spoliation of evidence, those issues are properly raised in the trial court in the first instance. " '[P]roviding false discovery responses and spoliation of evidence' " are sanctionable misuses of the discovery process. (*Kwan Software Engineering, Inc. v. Hennings* (2020) 58 Cal.App.5th 57, 74.) Where misuse is shown, monetary, issue, and terminating sanctions may be available. (§ 2023.030; see also *Cedars-Sinai Medical Center v. Superior Court* (1998) 18 Cal.4th 1, 12 (*Cedars-Sinai*); *City of Los Angeles v. PricewaterhouseCoopers, LLP* (2024) 17 Cal.5th 46, 71 & fn. 4.) Moreover, if a party "willful[ly] suppress[es]" evidence the other party may secure an instruction authorizing the trier of fact to consider that conduct. (See Evid. Code, § 413; see also *Cedars-Sinai*,

---

[3] Beagle testified that Target surveillance video is routinely deleted after 30 days unless it is saved.

at p. 12.)[4]  But Hughes has neither challenged the court's pretrial discovery rulings nor identified any authority for directly challenging a jury verdict based on a party's deficient discovery responses.

To the extent Hughes's arguments might be a challenge to the sufficiency of the evidence, "we 'consider the whole record, view the evidence in the light most favorable to the judgment, presume every fact the trier of fact could reasonably deduce from the evidence, and defer to the trier of fact's determination of the weight and credibility of the evidence.' " (*Acosta v. MAS Realty, LLC* (2023) 96 Cal.App.5th 635, 650.)  And when it was the appellant who bore the burden of proof at trial, "the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law.  [Citations.]  Specifically, the question becomes whether the appellant's evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.' " (*Shaw v. County of Santa Cruz* (2008) 170 Cal.App.4th 229, 279.)

Here, nothing in the record demonstrates that Santiago and Beagle's testimony could only be false.  To be sure, the jury could properly consider the absence of corroboration in assessing Santiago's and Beagle's credibility and the strength of Target's defense theory, given Hughes's arguments that Target could have had access to more compelling evidence.  (See Evid. Code, § 412.)  And Hughes's counsel reiterated this point in closing and rebuttal arguments.  But, even if it had been Target that bore the burden of proof at trial, the testimony of Santiago and Beagle would be sufficient to

---

[4] There are also criminal penalties for spoliation and attorneys who participate in spoliation are subject to professional discipline.  (*Cedars-Sinai*, *supra*, 18 Cal.4th at pp. 12–13.)

support the jury's verdict.[5]  (See generally *Zinn v. Ex-Cell-O Corp.* (1957) 148 Cal.App.2d 56, 85; *People v. Jones* (2013) 57 Cal.4th 899, 963–964 [reciting "standard" instruction that " 'testimony by one witness, which you believe, concerning any fact is sufficient for the proof of that fact' "].)  The jury could generally credit Santiago's and Beagle's version of events rather than Hughes's.[6]  (See generally *Pope v. Babick* (2014) 229 Cal.App.4th 1238, 1246; *Jones*, at p. 963 [discussing deference to jury's credibility determinations].)  Lacking a proper basis to second-guess the trier of fact, we reject Hughes's claims of falsity.

### 2.    *Voir Dire*

During voir dire, Target asked, "There was a story on the [10:00] o'clock news last week on Channel 2, where the CEO of Target remarked about retail theft and what a problem it is for the stores.  [¶]  First of all, did anybody see that?"  Hughes's counsel interjected, "I'm going to object -- wait.  I'm going to object."  After the trial court overruled the objection, two potential jurors reported that they saw the story.  Without further objection from Hughes, Target then asked those jurors about their interpretation of and reaction to the story.  Again without further objection, Target asked the potential jurors about their general familiarity with retail "theft or shrinkage" and their feelings about those issues.

Hughes contends on appeal that Target's prefatory question was a ploy to present inadmissible hearsay from Target's CEO, biasing the jury by framing theft (and return fraud) as a serious problem.  She forfeited this contention by neither stating the basis for

---

[5] Hughes's substantial evidence argument rests on the premise that Target relied on false evidence.  We do not discern any alternative substantial evidence argument applicable if Santiago and Beagle's testimony is admissible.

[6] There are some inconsistencies between Santiago and Beagle's trial testimony.  But their version of events is generally consistent, and in stark contrast with Hughes's version.

the objection nor requesting an admonition. (*Sabella v. Southern Pac. Co.* (1969) 70 Cal.2d 311, 318 [stating general requirement of " 'a timely and proper objection and a request that the jury be admonished' [Citation.] . . . ' "to give the court an opportunity to . . . correct the error and avoid a mistrial" ' "].)

Even if Hughes preserved her objection for appeal, the trial court did not abuse its discretion. "[T]he trial judge shall permit liberal and probing examination calculated to discover bias or prejudice" (§ 222.5, subd. (b)(1); see also § 190) and has "considerable discretion . . . to contain voir dire within reasonable limits" (*People v. Williams* (1981) 29 Cal.3d 392, 408, superseded by statute as stated in *People v. Noguera* (1992) 4 Cal.4th 599, 646). Exercising its discretion, the trial court could reasonably have determined that Target's question was relevant to the prospective jurors' ability to evaluate with an " ' " 'open mind' " ' " the reasonableness of a security employee's actions on suspecting return fraud. (*People v. Butler* (2009) 46 Cal.4th 847, 859.)

### 3. *Expert Testimony*

"[A]n expert may rely on hearsay in forming an opinion but . . . may not relate case-specific facts asserted in hearsay statements 'unless they are independently proven by competent evidence or are covered by a hearsay exception.' " (*In re Marriage of Lietz* (2024) 99 Cal.App.5th 664, 672 (*Lietz*), quoting *Sanchez*, *supra*, 63 Cal.4th at p. 686.) " '*The expert is generally not permitted . . . to supply case-specific facts about which he has no personal knowledge.*' " (*Lietz*, at p. 673; see also *Yaffee v. Skeen* (2024) 106 Cal.App.5th 1281, 1317 [*Sanchez* limits " ' "case-specific information that an expert relates to a jury, not materials upon which the expert relies" ' "].) We review claims of evidentiary error for abuse of discretion. (*People v. Holmes, McClain and Newborn* (2022) 12 Cal.5th 719, 766, 773.) And "an erroneous evidentiary ruling requires reversal only if ' "there is a reasonable probability that a result more favorable to the appealing party would have been reached in the absence of the error." ' " (*D.Z. v. Los Angeles*

9

*Unified School Dist.* (2019) 35 Cal.App.5th 210, 231; see also *People v. Valencia* (2021) 11 Cal.5th 818, 840.)

We find that any error in the trial court's handling of expert testimony was harmless here.

### a.      *Additional Background*

Hughes called James Murphy, a professional "security expert witness." Murphy opined that it would violate Target's training for a security employee to approach a customer based on word-of-mouth information and it would violate Target's policies and procedures for a security employee to approach a customer on the belief that the customer matches a photograph. On defense objections, the trial court prevented Murphy from testifying—based on records provided by Hughes's counsel—to what Target's policies and procedures are and what facts could be discerned from Target's document production in this case.[7] Hughes specifically appears to dispute the trial court's rulings on the following questions:  (1) "Under Target's policies and procedures, if there's a return fraud incident, what documentation would be required?" (2) "[W]hat training does a Target TPS receive as far as approaching a customer?" (3) Does Target's TPS employee training "set forth . . . how they're to handle situations?" (4) "Within Target's policies and procedures, . . . what would be required for a Target TPS guard?" (5) "Under Target's policies and procedures, . . . do you need a legitimate business reason . . . to approach a customer?" (6) "[W]ithin . . . all the documents produced by Target, is there any documentation within the Target system as to this return fraud?"  Hughes also

---

[7] In limine, Target represented that it had produced its Asset Protection directives in discovery but that Hughes complained about the scope of Target's redactions, whereas a copy Hughes obtained on the internet was unredacted. The trial court ruled that only authenticated Asset Protection directives could be discussed. And the trial court invited Hughes to authenticate the Code of Ethics her counsel obtained on the internet by examining a testifying Target employee. Murphy identified neither the unredacted Asset Protection directives from the internet nor the Code of Ethics as bases for his opinions.

challenges the trial court's decision to preclude Murphy from saying what can be inferred from the absence of "a report and photograph" in Target's "case management system" and from providing the basis for his opinion that Santiago violated Target's "own policies and procedures" when he accused Hughes of return fraud.

Target's expert, Donald Horan, opined that Target's training of security employees met industry standards. Based on his review of employee statements, Horan opined that Target's employees acted consistent with their training, their job descriptions, and industry standards in their interaction with Hughes. Horan acknowledged that it would be against Target policy to confront a customer without any basis and that he would need the factual basis for any accusations to assess whether a security employee acted properly in making them.

### b.  *Murphy*

Hughes contends that the trial court improperly prevented Murphy from describing Target's policies, either directly or as the basis for his opinions. (Cf. *Sanchez*, *supra*, 63 Cal.4th at p. 682 ["When an expert relies on hearsay to provide case-specific facts, considers the statements as true, and relates them to the jury as a reliable basis for the expert's opinion, it cannot logically be asserted that the hearsay content is not offered for its truth"].) Hughes argues that "Target's . . . Asset Protection . . . Directives as to training, record retention, incident reports, confrontation requirements, return policy, [and] job core duties" (underscoring omitted) are not case-specific hearsay because they are "true whether the event happened or not." Hughes reads "case specific" too narrowly.

Although a policy is not of itself a "fact," Target's choice to implement a given set of policies in its stores is a case-specific fact. " 'Case-specific facts are those relating to the particular events and participants alleged to have been involved in the case being tried.' " (*Lietz*, *supra*, 99 Cal.App.5th at p. 673.) Target's policies relate to its employees' conduct during and after the incident with Hughes. That Target's policies

11

exist independent of the events giving rise to Hughes's suit does not render them a matter of general knowledge. Indeed, Murphy had no independent knowledge of the facts—he learned the policies by reviewing records provided to him by Hughes's counsel.

Counsel did not establish that Murphy's knowledge of the case-specific facts derived from admissible hearsay. So the trial court did not abuse its discretion by preventing Murphy from characterizing these policies as Target's, and without that characterization, their content was irrelevant. (See generally *People v. DeHoyos* (2013) 57 Cal.4th 79, 132 ["a trial court has broad discretion to determine whether a party has established the foundational requirements for a hearsay exception"].)

Hughes alternatively contends that even if her expert could not relate Target's policies to the jury in the first instance, the trial court improperly prevented the expert from offering opinions based on case-specific facts already in evidence. We understand Hughes's point to be that some of the policies she asked her expert to relate were already in evidence, so he should have been permitted to describe them. But Hughes has not demonstrated prejudicial error.

First, Hughes's theory of prejudice, as we understand it, is that she was not permitted to have her expert describe Target's policies. In one concrete example, she explains that she wanted to *rebut* Beagle's testimony about Target's video retention policy.[8] To the extent Hughes wished to elicit from Murphy policies that were not in evidence, to counter earlier testimony about what the policies were, Beagle's earlier testimony could not have been the basis for Murphy's opinion. And if Hughes was

---

[8] Hughes points to a written video retention policy, which she maintains should have applied to require Target to retain the video of her interaction with Santiago and Beagle for five years. We are unable to discern in her appellate briefing an argument that she properly sought admission of the policy by some means other than Murphy's testimony and was denied.

merely asking Murphy to restate policies that were already in evidence, Murphy's testimony would have been cumulative.

Second, while Hughes observes that several witnesses had testified before Murphy took the stand, she does not identify what testimony supplied facts that served as an admissible basis for Murphy's opinions. (See *City of Santa Maria v. Adam* (2012) 211 Cal.App.4th 266, 287 ["Rather than scour the record unguided, we may decide that the appellant has waived a point urged on appeal when it is not supported by accurate citations to the record. [Citations.] . . . The larger and more complex the record, the more important it is for the litigants to adhere to appellate rules"].) Nor did she do so at trial. Of course, if she intended to elicit Murphy's opinion about the application of policies already in evidence to hypothetical case-specific facts, she could have asked such a question. The questions at issue here merely called for Murphy to state the content of Target's applicable policies, nothing more.

One of Hughes's questions differed from the rest. Hughes asked Murphy to state whether Target's document production included "documentation within the Target system as to this return fraud." After the trial court sustained Target's *Sanchez* objection, Hughes asked Murphy if he "s[aw] any documentation as to Kathy Hughes and return fraud" in "reviewing the documentation within the system and the record." Without receiving an objection, the trial court initiated an unreported sidebar, after which Hughes took up a new line of questioning.

We understand that Hughes sought testimony from Murphy establishing that Target's document production lacked responsive evidence that Hughes had ever committed a return fraud. Any error in preventing Hughes from eliciting this testimony was harmless because Murphy's response would have been cumulative: Beagle admitted that Santiago could not show him any picture when they searched for documentation, and no such picture or report was ever admitted in evidence. As the trial court later noted, "[T]he uncontradicted evidence in this case is that there were no documents related

13

to . . . Hughes, and I think it's abundantly clear . . . and will be to the jury as well, that whatever suspicions might have been harbored by . . . Santiago that night were incorrect . . . and that there is not any evidence of any wrongdoing by her related to Target." Murphy's testimony would not have appreciably added to the weight of the evidence on this point.

Hughes has not shown that the trial court prejudicially abused its discretion in handling Murphy's testimony.

### c. *Horan*

Hughes contends that the trial court erred by permitting Horan to offer opinions about Santiago's compliance with Target's policies (assuming Santiago's version of events were true) and by sustaining certain objections to Hughes's cross-examination. Hughes has not shown that the trial court abused its discretion in these rulings.

First, the trial court overruled Hughes's objections to three items: (1) Horan's testimony that he asked for Target's return policy during his review of case documents to evaluate whether Target complied with the policy; (2) Horan's opinion that Target's employees acted consistent with their training, job descriptions, and industry standards;[9] and (3) Target asking whether, under certain assumed facts, Santiago's conduct was "consistent with Target's policies and procedures."

As to the return policy, the testimony Hughes objected to was foundational, merely identifying the materials Horan reviewed in forming his opinions. The trial court properly overruled the objection. Moreover, the return policy was already in evidence by the time Horan testified. Indeed, Horan later read the policy to the jury without objection in response to jury questions.

---

[9] Hughes objected to Target asking whether Horan formed an opinion, not to Target next asking what the opinion was. But because the trial court's response indicated that Target was entitled to elicit the expert's opinion, a second objection was unnecessary.

14

As to Horan's opinions about employees' compliance with training, job descriptions, policies, and procedures, Target elicited only the opinions and not underlying facts derived from case-specific documents not admitted into evidence. This is consistent with the trial court's management of Murphy's testimony. Murphy was likewise permitted to give opinions,[10] but as we have explained he was precluded from relating Target policies that were not admitted in evidence. The trial court did not abuse its discretion by limiting expert testimony relating case-specific hearsay to those matters that were independently admitted or admissible. (See *Sanchez*, *supra*, 63 Cal.4th at pp. 685–686.) Nor did the trial court abuse its discretion in permitting Horan to answer a hypothetical question assuming facts for which there was independent competent evidence. (See *People ex rel. Reisig v. Acuna* (2017) 9 Cal.App.5th 1, 34.)

Second, the trial court sustained two Target objections to Hughes's cross-examination of Horan: (1) a vagueness objection to a hypothetical about the inferences to be drawn from a return without a receipt; and (2) a *Sanchez* objection to Hughes's request for Horan to "direct [his] attention to case files incident investigation report." Hughes has shown no abuse of discretion as to either objection.

Hughes contends that Target's sustained vagueness objection improperly precluded her from asking whether a "security intervention allegedly over a receipt gave Target security a basis to accuse a customer of return fraud." But what Hughes asked was: "[Assume] Target security . . . intervenes over a return without a receipt. . . . [¶] . . . [¶] That would not give . . . the Target security guard . . . a basis to then confront a consumer *for a prior return fraud*. That wouldn't be allowed under their policies and

_____

[10] For example, Murphy was permitted to: (1) opine that Santiago violated Target's policies and procedures by accusing Hughes of return fraud; and (2) answer, over Target's *Sanchez* objection, a hypothetical question evaluating whether, under assumed facts, a Target employee violated Target's policies and procedures. We reject Hughes's contention that the trial court gave Target more latitude in adducing expert opinions than she was afforded.

15

procedures; true?" (Italics added.) The trial court sustained the objection because Hughes was "talking about two totally independent events." A vagueness objection targets only the form of a question, not its substance: If Hughes wanted to ask whether a concern about a receipt suggested return fraud, she could have clarified her question. The trial court did not abuse its discretion by, in effect, requiring her to do so. (See Evid. Code, § 765, subd. (a) [requiring the trial court to "exercise reasonable control over the mode of interrogation"].)

As to Target's *Sanchez* objection, Hughes complains that Horan was "[p]revented from being examined on Target's [Asset Protection] [d]irectives as to case files incident investigative reports." But we are unable to ascertain from the record what line of questioning Hughes intended to pursue in the trial court or the trial court's ultimate reason for preventing her from pursuing it. When Target objected, Hughes had not yet asked a question and had only directed Horan's attention to the "case files incident investigation report" in exhibit 105, which concerned Target's record retention schedule. In sustaining Target's *Sanchez* objection, the court invited counsel to approach. After an unreported sidebar conference, the court reiterated, "The objection is sustained" and invited Hughes's counsel to "ask [his] next question." In a declaration supporting Target's opposition to Hughes's eventual new trial motion, Target's counsel represented that the trial court precluded Hughes from pursing the intended line of questioning because it was beyond the scope of Horan's opinions and direct examination.

The record does not show what Hughes wanted to ask Horan about exhibit 105 or whether Hughes's intended line of inquiry was appropriate. Hughes notes that Evidence Code section 721 permits an expert to be cross-examined on the matter on which the opinion is based. But the record does not reflect that exhibit 105 was a matter upon which Horan's opinion was based. During direct examination, Horan referred generally to reviewing Target policies and specifically to several policies, but never mentioned reviewing the exhibit 105 or a record retention policy. Nor is it apparent that exhibit 105,

16

a record retention policy, was relevant to Horan's opinions, which related to the conduct of Target's employees during the incident with Hughes. So we cannot identify either a foundational basis for Horan to relate the substance of Target's record retention policy— if that was Hughes's aim—or any other appropriate basis for Hughes to question Horan about exhibit 105. The trial court did not abuse its discretion in heading off that line of questioning.

### 4.   *Exhibits*

Hughes challenges the trial court's refusal to admit a handful of Target's discovery responses into evidence. The trial court did not abuse its discretion in denying Hughes's requests.

Several of the exhibits only reinforced points already established by other evidence: (1) Santiago did not look at a picture of Hughes before stopping her; (2) Target did not make a report about the incident; (3) Target did not have any writings about Hughes; and (4) Target did not preserve the security footage of the incident. We do not disturb the trial court's exercise of its discretion to exclude this cumulative evidence. (See *People v. Robinson* (2020) 47 Cal.App.5th 1027, 1032.)

Hughes also sought to establish that Target failed to disclose in discovery that Hughes had contact with a customer service employee—in addition to Beagle and Santiago—and had inaccurately identified Daniela Peregretti as the person in charge of Target security for its Northern California stores in 2015. But we see nothing in the record or Hughes's briefing to suggest that she ever sought evidence, issue, or terminating sanctions. To the contrary, Hughes at trial made no objection to Beagle's late identification of the customer service employee, and she called Peregretti as a witness despite knowing Peregretti had limited relevant knowledge. And nothing in the testimony of either witness compelled the admission of Target's related discovery responses.

17

As to the customer service employee, there was no dispute at trial that a customer service employee was a percipient witness, although Hughes and Beagle differed in their recollection of the employee's gender. Beagle testified for the first time at trial that, after his deposition, he determined the employee's identity from an unspecified record. The discovery response Hughes sought to admit reflected that, more than a year before Beagle's deposition, Target had identified only Beagle and Santiago as the employees who had contact with Hughes during the incident, omitting the customer service employee.

As to Peregretti, Target identified her as their "Assets Protection Business Partner" when ordered to respond to Hughes's request to identify "the person in charge of Target security for Northern California Target stores in the year 2015." Peregretti would later testify at deposition and trial—called as a witness by Hughes—that Target's security employees did not report to her. While Peregretti's testimony made her a poor fit for Hughes's interrogatory, Hughes has identified no basis to infer that some other Target employee was a better fit and that Target withheld that person's identity.

The trial court did not abuse its discretion by heading off an at-best tangential exploration of the parties' pretrial efforts to identify witnesses in this case. (See Evid. Code, § 352; see also *Perry v. Kia Motors America, Inc.* (2023) 91 Cal.App.5th 1088, 1097–1098.)

**B.**     *Summary Adjudication*

**1.**     *Standard of Review*

When a defendant has prevailed on summary adjudication, " ' "we review the record de novo to determine whether [they have] conclusively negated a necessary element of the plaintiff's case or demonstrated that under no hypothesis is there a material issue of fact that requires the process of trial." ' " (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 767; see also *Wilson v. County of San Joaquin* (2019) 38 Cal.App.5th 1, 9 [explaining that summary adjudication and summary judgment share

18

the same standard of review].)  The moving defendant "bears the burden of persuasion that there is no triable issue of material fact and that [it] is entitled to judgment as a matter of law."  (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850, fn. omitted.)  Upon a defendant's prima facie showing of the nonexistence of a triable issue of material fact, the plaintiff "is then subjected to a burden of production . . . to make a prima facie showing of the existence of a triable issue of material fact."  (*Ibid*.)  "We liberally construe the evidence in support of the party opposing summary judgment and resolve doubts concerning the evidence in favor of that party."  (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1037 (*Yanowitz*).)

### 2.    *Hughes's General Challenge to Summary Adjudication*

Hughes contends that summary adjudication of any claims was improper because Target "presented [evidence] to the court [it knew] could not be true" and "falsified and/or concealed" evidence in its control.  But as a reviewing court we do not weigh " 'the plaintiff's evidence or inferences against the defendant['s].' "  (*Andrews v. Foster Wheeler LLC* (2006) 138 Cal.App.4th 96, 113.)  Of course, Hughes was and is entitled to a liberal construction of her evidence and the resolution of doubts concerning the evidence in her favor.  (*Yanowitz*, *supra*, 36 Cal.4th at p. 1037.)  But we are unable to discern any reason that the legal questions posed by the requests for summary adjudication were not properly before the trial court on Target's motions.

### 3.    *Unruh Civil Rights Act*

"[A] plaintiff seeking to establish a case under the Unruh [Civil Rights] Act must plead and prove intentional discrimination in public accommodations in violation of the terms of the Act."  (*Harris v. Capital Growth Investors XIV* (1991) 52 Cal.3d 1142, 1175 (*Harris*).)[11]  "[A] plaintiff bears the initial burden to establish a prima facie case

---

[11] Although evidence of disparate impact "may be probative of intentional discrimination" (*Harris*, *supra*, 52 Cal.3d at p. 1175), no such evidence was presented here.

19

of . . . discrimination." (*Mackey v. Trustees of California State University* (2019) 31 Cal.App.5th 640, 661 (*Mackey*) [applying burden-shifting framework of *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792, 802 to Unruh Civil Rights Act claims]; see also *Husman v. Toyota Motor Credit Corp.* (2017) 12 Cal.App.5th 1168, 1181.) To prevail, Hughes would have to show that: (1) she was a member of a protected class, (2) Target denied her full and equal services at its business establishment, and (3) some other circumstance suggests discriminatory motive. (See *Liapes v. Facebook, Inc.* (2023) 95 Cal.App.5th 910, 922 [explaining that Unruh Civil Rights Act requires intentional discrimination or denial of full and equal treatment based on protected status]; *Mackey*, at p. 661 [stating elements of prima facie case in employment context and explaining that elements " 'may vary depending on the particular facts' "].)

As the moving defendant, Target bore the initial burden of showing that an element of the prima facie case was lacking or that the adverse action was based on legitimate nondiscriminatory factors. (*Mackey*, *supra*, 31 Cal.App.5th at p. 662.) Target also bore the ultimate burden of proving "that *no reasonable jury* could find [its employees] acted with discriminatory intent." (*Id.* at p. 671.) Target carried its initial burden by producing admissible evidence that Santiago denied Hughes equal treatment because of the legitimate nondiscriminatory factor of suspected return fraud, not because of her membership in a protected class. (See, e.g., *Mackey*, at p. 662.) The burden then shifted to Hughes to "*rebut* [Target's] facially dispositive showing by pointing to evidence which nonetheless raises a rational inference that intentional discrimination occurred." (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 357 (*Guz*).)

Hughes's evidence was insufficient to carry her burden because it addressed only the veracity of Target's stated reason for stopping her. "[A]n inference of intentional discrimination cannot be drawn solely from evidence, if any, that the company lied about its reasons. The pertinent statutes do not prohibit lying, they prohibit discrimination. [Citation.] . . . [T]here must be evidence supporting a rational inference that *intentional*

20

*discrimination, on grounds prohibited by the statute, was the true cause* of the employer's actions." (*Guz, supra*, 24 Cal.4th at pp. 360–361.) "If the plaintiff produces *no* evidence from which a reasonable fact finder could infer that the employer's true reason was discriminatory, the employer is entitled to summary judgment." (*Hicks v. KNTV Television, Inc.* (2008) 160 Cal.App.4th 994, 1003 (*Hicks*); see also *McGrory v. Applied Signal Technology, Inc.* (2013) 212 Cal.App.4th 1510, 1531–1532; *Arnold v. Dignity Health* (2020) 53 Cal.App.5th 412, 425–426.)

Even if Hughes's evidence supported a reasonable inference that Target's stated reason for stopping her was false, there is no evidence that Target's true reason for stopping Hughes was discriminatory. (See *Hicks, supra*, 160 Cal.App.4th at p. 1003.) So Hughes did not supply evidence sufficient to support a rational inference that intentional discrimination was the true cause of Target's actions. (See *Guz, supra*, 24 Cal.4th at pp. 357, 360–361.) There is no direct or circumstantial evidence that Santiago or Beagle personally harbored discriminatory animus. (Cf. *Gupta v. Trustees of California State University* (2019) 40 Cal.App.5th 510, 519–520 [discussing use of "[c]omparative evidence" to prove intentional discrimination].)

In addition to her evidence that Santiago lied about his reason for stopping her, Hughes asserts the following facts in her appellate briefing: (1) Hughes is female and Portuguese, both characteristics she contends were "observable"; (2) Santiago in his deposition testimony remembered seeing Hughes once at a mall before the incident.[12] Taking these asserted facts together, they do not raise a reasonable inference that Target,

---

[12] Hughes also adds that Santiago had a practice of giving and enforcing undocumented verbal trespass bans. But without any evidence that these disproportionately impacted women or persons of Portuguese descent, the asserted practice lends nothing to the issue of discriminatory animus. And because the absence of evidence does not raise a triable issue, without more, Hughes's reliance on the fact of Target's not tracking Santiago's customer interactions or not having him supervised by other security personnel at the time of the incident is similarly unavailing.

21

or Santiago, discriminated against Hughes on the basis of her gender, ethnicity, ancestry, or national origin, any more than we could infer that Hughes discriminated against Santiago on the basis of his. (See *King v. United Parcel Service, Inc.* (2007) 152 Cal.App.4th 426, 433 [explaining that while we "liberally construe" plaintiff's showing, it "remains subject to careful scrutiny"].) Hughes's subjective belief that Santiago confronted her because she is a Portuguese woman does not raise a triable issue of fact that this was so. (*Ibid.*) And targeting a person, even wrongly, based on an actual prior encounter with that same person suggests not profiling but its opposite. (Cf. Pen. Code, § 13519.4, subd. (e) [defining law enforcement " '[r]acial or identity profiling' " as "the consideration of, or reliance on, to any degree, actual or perceived race, color, ethnicity, national origin, age, religion, gender identity or expression, sexual orientation, or mental or physical disability in deciding which persons to subject to a stop or in deciding upon the scope or substance of law enforcement activities following a stop, except that an officer may consider or rely on characteristics listed in a specific suspect description"].) So Hughes did not carry her burden in resisting Target's summary adjudication motion. (*Guz, supra*, 24 Cal.4th at pp. 357, 360–361.)

4.      ***Intentional Infliction of Emotional Distress***

"A cause of action for [intentional infliction of emotional distress] requires proof . . . (1) [of] extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) [that] the plaintiff suffered severe emotional distress; and (3) [that] the defendant's extreme and outrageous conduct was the actual and proximate cause of the severe emotional distress." (*Crouch v. Trinity Christian Center of Santa Ana, Inc.* (2019) 39 Cal.App.5th 995, 1007.)

As pleaded, the extreme and outrageous conduct underpinning the intentional tort consisted of Santiago's false accusation of wrongdoing in a public space, Beagle's failure to correct Santiago's false accusation after it could not be substantiated, and Beagle's decision to verbally enforce Santiago's verbal directive that Hughes had to leave the store

22

and could not return.[13]  So Hughes's claim depended on the factual premise that Target acted on false pretenses.

Target secured summary adjudication of this cause of action on the ground that even under Hughes's version of the facts, Target's conduct was not severe or outrageous. Even assuming a reasonable jury could find Santiago's conduct outrageous (and Beagle's thereafter) if Santiago *knew* there were no grounds for suspicion, the jury here decided that Santiago acted at most upon a reasonable mistake of fact and not on false pretenses. The jury's special verdict on Hughes's closely related negligence claim demonstrates that any error in granting summary adjudication was harmless.

Hughes's primary theory of negligence depended on her contention that Santiago falsely accused her of wrongdoing.  The trial court instructed the jury that "[n]egligence is the failure to use reasonable care to prevent harm to oneself or to others.  . . .  [¶]  A person is negligent if that person does something that . . . a reasonably careful person would not do in the same situation, or fails to do something that a reasonably careful person would do in the same situation."  In closing argument, Hughes argued that Target was negligent because it "falsely accus[ed] [her] of return fraud without any basis."  In response, Target argued that its employees were not negligent because they acted reasonably based on the information available to them at all stages of the interaction— necessarily implying that their accusations were reasonable, not false.  Based on its contention that its employees acted reasonably, Target "ask[ed] for a finding of no negligence."  The jury made that finding on the special verdict form.

_____

[13] As with her Unruh Civil Rights Act claim, Hughes alleged in support of her claim for intentional infliction of emotional distress that Santiago profiled her based on her gender and ethnicity.  But her subjective belief as to his unexpressed motivation is irrelevant to her claim for intentional infliction of emotional distress.  (See *Janken v. GM Hughes Electronics* (1996) 46 Cal.App.4th 55, 80 [holding that tacit "improper motivation" does not make personnel management activity "outrageous"].)  And as we have explained, she has no objective basis for her stated belief.

Hughes thus had a full opportunity to litigate at the trial of her negligence claim the factual predicates necessary to her claim of intentional infliction of emotional distress. Both claims revolved around a dispute between Hughes, on one hand, and Beagle and Santiago, on the other, about what happened between them. As instructed, the jury's finding of no negligence reflects that Target's employees neither did "something that . . . a reasonably careful person would not do in the same situation" nor failed "to do something that a reasonably careful person would do in the same situation." Unpersuaded that Target's employees failed to exercise reasonable care, the jury would not have been persuaded that the same employees engaged in extreme and outrageous conduct with the intention of causing, or reckless disregard of the probability of causing, emotional distress. The jury's finding that Target was not negligent therefore defeats Hughes's claim for intentional infliction of emotional distress. Any error in summarily adjudicating the latter claim was harmless. (See *Federal Deposit Ins. Corp. v. Dintino* (2008) 167 Cal.App.4th 333, 343 [noting general rule that denial of summary adjudication is not prejudicial where the same question is later decided adversely to the moving party after a trial on the merits]; see also *Westlye v. Look Sports, Inc.* (1993) 17 Cal.App.4th 1715, 1742, fn. 19 [accepting "the general proposition that facts found by the trial court following trial may be relevant to the question whether error in a pretrial ruling was prejudicial" but concluding that failure to adduce trial evidence in support of claim that had been summarily adjudicated did not suggest harmlessness].)

## C.    *Costs*

Hughes challenges Target's section 998 offers and the award of costs more generally. The section 998 offers were valid. Hughes's other challenges to the costs award are unavailing.

"If an offer made by a defendant" under section 998 "is not accepted and the plaintiff fails to obtain a more favorable judgment or award, the plaintiff shall not recover . . . postoffer costs and shall pay the defendant's costs from the time of the offer,"

24

potentially including expert witness costs. (§ 998, subd. (c)(1); see also *Ignacio v. Caracciolo* (2016) 2 Cal.App.5th 81, 86 (*Ignacio*).) To trigger this shifting of costs, "[a] section 998 offer must be in writing, must be served on the offeree, and must allow judgment to be taken or an award to be entered in accordance with the terms and conditions stated in the offer. (§ 998, subd. (b).) [¶] [It] must also 'be sufficiently specific to allow the recipient to evaluate the worth of the offer and make a reasoned decision whether to accept the offer.' " (*Kinney v. City of Corona* (2023) 99 Cal.App.5th 1, 17; see also *Glassman v. Safeco Ins. Co. of America* (2023) 90 Cal.App.5th 1281, 1313 (*Glassman*).)

"The burden is on the offering party to demonstrate that the offer is valid under section 998," and we review de novo whether the offering party met that burden. (*Ignacio*, *supra*, 2 Cal.App.5th at p. 86.) If the section 998 offer was valid, "the burden then shifts to the offeree to demonstrate that the offer was unreasonable or not made in good faith." (*Glassman*, *supra*, 90 Cal.App.5th at pp. 1313–1314.) We review for abuse of discretion a trial court's determination whether the offeree met the burden of demonstrating the offer was reasonable and made in good faith (*Covert v. FCA USA, LLC* (2022) 73 Cal.App.5th 821, 834.)

Target's section 998 offers were valid. They were in writing, served on Hughes, and allowed judgment to be taken in a fixed amount in exchange for a release of all of Hughes's claims, with the parties to bear their own fees and costs. The offers were sufficiently specific to allow Hughes to evaluate the worth of the offer and make a reasoned decision whether to accept the offer.

Citing *Barella v. Exchange Bank* (2000) 84 Cal.App.4th 793, Hughes contends that the offers were invalid because they required her to release Unruh Civil Rights Act claims intended to vindicate her good name. But *Barella* invalidated a section 998 offer in a defamation action because the offer was conditioned on a confidentiality provision incapable of valuation. (*Barella*, at pp. 795, 800–803.) Because Target's section 998

25

offers, in contrast, had no confidentiality provision, Hughes had no similar problem evaluating Target's offer. Nor does the statute exempt private Unruh Civil Rights Act claims. (See § 998, subds. (g), (i) [identifying exempt claims]; see also *Doran v. North State Grocery, Inc.* (2006) 137 Cal.App.4th 484, 486, 491–492 [addressing impact of § 998 judgment on fee liability in an Unruh Civil Rights Act suit].)

Disputing good faith, Hughes repeats her contention that Target committed misconduct by relying on Santiago's and Beagle's testimony. On this basis, Hughes argues that Target's section 998 offer cannot have been in good faith (and that Target should not be awarded any costs, postoffer or otherwise) because it won its favorable judgment unjustly. But Target's mistaken identity theory is reconcilable with the record. Hughes has not shown that the trial court abused its discretion in determining that Target's settlement offers were made in good faith.[14] Nor do these arguments support a broader denial of costs.

## III. DISPOSITION

The judgment and postjudgment award of costs are affirmed. Target is entitled to its costs on appeal.

---

[14] The record includes a minute order memorializing the trial court's finding that the section 998 offer was valid. No record of the hearing or other more detailed explanation of the trial court's reasoning has been provided to us. We indulge all intendments and presumptions to support the trial court's order. (*IIG Wireless, Inc. v. Yi* (2018) 22 Cal.App.5th 630, 639.)

26

_____

LIE, J.

WE CONCUR:

_____

GROVER, Acting P. J.

_____

BROMBERG, J.

*Hughes v. Target Corporation*
H050996, H051227, H051318